[Cite as *State v. Coleman*, 2026-Ohio-2634.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-47 |
| Appellee | : | |
| | : | Trial Court Case No. 23-CR-066 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| KEVON E. COLEMAN | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on July 10, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately send a copy of the court's ruling to each party and note that action on the docket. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Mary K. Huffman*

_____
MARY K. HUFFMAN, JUDGE

LEWIS, P.J., and HANSEMAN, J., concur.

ROBERT ALAN BRENNER, Attorney for Appellant
JOHN M. LINTZ, Attorney for Appellee

HUFFMAN, J.

{¶ 1} Kevon E. Coleman appeals from his judgment entry of conviction on one count of aggravated burglary, one count aggravated robbery, and one count of kidnapping, all with firearm specifications, as well as one count of theft (motor vehicle) and one count of having weapons while under disability. For the following reasons, the judgment of the Clark County Common Pleas Court is affirmed.

## I. Procedural History

{¶ 2} On January 30, 2023, Coleman was indicted for the above-listed offenses. After a trial by jury on May 7, 2025, disposition occurred on June 12, 2025. The court imposed an aggregate term of 43 to 48.5 years and designated Coleman a violent offender. He timely appealed.

## II. Assignments of Error and Analysis

{¶ 3} Coleman asserts two assignments of error, which we consider together. He argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. According to Coleman, "no evidence was presented . . . to place [him] at the scene of the crime," and the victim, E.T., was unable to identify her attackers. He asserts that his Crim.R. 29 motion for acquittal should have been granted. Coleman claims that although his work glove was found in the Jeep, "the State failed to prove that [it] was at the scene because Coleman took it there," and that the glove alone was not sufficient to link him to the crime. He notes that the State's expert in DNA analysis

2

was unable to determine when his DNA was deposited in the glove, and he argues that a "conviction is based on insufficient evidence if it is based solely on the presence of DNA."

{¶ 4} In his second assignment of error, Coleman repeats the above arguments regarding sufficiency and manifest weight. He further directs our attention to the testimony of Samiyah Mu'min, the mother of his children, that he wore black-and-yellow gloves while working and had multiple pairs. Coleman notes that the gloves were also accessible to his acquaintance Tyuan Smith, who was apprehended after fleeing the Jeep where the glove was found.

{¶ 5} Before addressing Coleman's assigned errors, we review the trial transcript. E.T. testified that, on October 23, 2021, she resided on West Perrin Avenue in Springfield, where a friend of hers also had been staying. After getting into bed for the night, E.T. heard a "thump," and she assumed that her friend was entering her home through a window, because he had previously done so when her front door was locked.

{¶ 6} After a second "thump," E.T. got out of bed and opened her bedroom door. She saw a "big group of men" standing in her front doorway, and when she tried to close her bedroom door, one of the men ran at her with a gun and ordered her to the floor. The man then dragged E.T. to her "clothing room," in the front of her home, and ordered her to lie down, according to her testimony. The man threatened to kill her, stating that her "dad was gonna get [her] killed." E.T. testified that the man told her that her father, who is known as "Fat Cat," owed them $15,000, and they demanded the money and "pills." Two months earlier, after a disagreement with his wife, E.T.'s father had lived with her, but then he and E.T. had a "falling out," and he left her home.

{¶ 7} E.T. testified that she was unable to see the faces of her attackers because all but their eyes were covered by clothing wrapped around their heads, and she was unsure

3

how many men or weapons were present. She stated that the men carried large guns, which they put to her head and beat her with. E.T. explained that while she was held in the clothing room by two men—one with light skin and the second with "long dreads"—a third man she described as having dark skin ransacked her entire home. To encourage the men to leave, E.T. told them that she owned handcuffs that they could use to restrain her, and they did so. Before leaving, they told her that if she got up, they would kill her.

{¶ 8} E.T. stated that her attackers took her PlayStation, the keys to her 2021 Jeep Compass (and ultimately the vehicle itself), and her purse, which contained $50 and a small bag of marijuana. After she heard a vehicle speed away, she "ripped the handcuffs" in two, got up, and called 911. A recording of the call was played for the jury, in which E.T. said that five men were in her home. E.T. identified photos of the condition of her home after it was ransacked, as well as photos of her damaged front door, her wrists in broken handcuffs, and a mark on her face from a gun. Finally, she identified photos of the interior of the driver's side of her Jeep depicting a glove that she stated was not hers, as well as her Playstation located in the passenger side of the vehicle.

{¶ 9} Officer Corey Schmidt of the Springfield Police Department testified that, on the date of the incident, he and his partner were dispatched to Perrin Avenue on the report of an aggravated robbery in which a Jeep was stolen. He observed the Jeep travelling south on Yellow Springs Street, and he turned around, pursuing the vehicle at over 100 miles per hour until it crashed into a fence at Walt's Auto Inc. Schmidt's cruiser camera video footage of the crash scene was played for the jury, and it depicted a man in dark clothing running along the fence line at the auto business. Schmidt observed Tyuan Smith run from the driver's side of the Jeep, and he identified photos of Smith with long dreadlocks. Schmidt

4

explained that he checked the Jeep for other occupants and then caught up to his partner, who had pursued and apprehended Smith.

{¶ 10} Officer Jason Byron testified that he was assigned to Crime Scene Investigations at the Springfield Police Division at the time of the incident, and he processed the Jeep for evidence. He identified the "yellow cloth glove with black circles on the palm" that was retrieved from the floor beneath the driver's seat. Byron took the glove and oral DNA swabs from Coleman, Tyuan Smith, and E.T. to the Bureau of Criminal Investigation ("BCI"), for further investigation.

{¶ 11} Detective Justin Massie of the Springfield Police Division testified that he investigated the incident and obtained surveillance video from Walt's Auto Inc., which was played in court. He explained that the video depicted two suspects running along the fence where the crash occurred. Massie stated that there was a one-foot gap under the fence through which the suspect who was not apprehended escaped. On March 29, 2023, Massie received a "hit" from a DNA database, meaning a successful match generated from the DNA from the glove compared against stored profiles, identifying Coleman. As part of a routine confirmation process, Massie secured a search warrant, located Coleman, and collected his DNA standard. Massie also collected the standards of E.T. and Smith. Relevant to the weapons under disability charge, Massie testified that Coleman had a prior conviction for burglary in Loraine County in Case No. 2016 CR 0943.

{¶ 12} Jessica Schepeler testified that she was employed as a forensic scientist at BCI, and the trial court designated her an expert in DNA analysis. She compared the known DNA standards obtained from Smith, E.T., and Coleman to a swab from the interior of the glove found in the Jeep. She determined that the glove contained a mixture of DNA from at least more than one person, with Coleman being the major contributor. Schepeler stated

that the major contributor to the DNA profile had a frequency of occurrence "rarer than 1 in 1 trillion unrelated individuals." She explained that the remainder of the DNA was not sufficient for comparison to the known standards or any standard. According to Schepeler, when multiple people wear a glove, "every person sheds DNA in a different amount," depending on circumstances such as temperature and whether a person's skin is dry or moist. She testified that she was unable to determine when the DNA in the glove was deposited. At the conclusion of the State's case, Coleman moved for an acquittal, and the court denied the motion.

{¶ 13} Counsel for Coleman called Samiyah Mu'Min as a witness. She testified that Coleman is the father of her two children, and they had previously lived together for four or five years. Mu'Min stated that Coleman worked at Highmark Roofing in October 2021 and for "probably for a few years," and he also did "warehouse work." Mu'Min was asked what Coleman wore while working, and she replied, "Gloves, and . . . black boots, black jeans, . . . . a long-sleeved shirt." Mu'min testified that Coleman had "[q]uite a few" pairs of the gloves, which she described as leather, and black and yellow in color. She stated that he kept them on the kitchen counter. According to Mu'min, Smith was a family friend who visited their home quite often, had access to the kitchen, and babysat their children. She denied that she viewed discovery photos of the glove from the Jeep, that Coleman told her about it, or that she knew a glove was at issue in the case. When shown the glove, Mu'min stated that it was "one of the Highmark gloves that [Coleman] would have for roofing." Mu'min denied lying for Coleman; she acknowledged, however, that, on February 3, 2023, she had told law enforcement that she was unaware of Coleman's whereabouts when in fact he was fleeing out a back window at the time.

{¶ 14} Although the State does not raise the issue, Coleman failed to renew his Crim.R. 29 motion for acquittal at the close of all the evidence. After his motion was denied at the conclusion of the State's case, he presented Mu'min's testimony. Coleman has therefore failed to preserve his insufficiency argument by not renewing it at the close of the evidence. *State v. Richardson*, 2016-Ohio-8081, ¶ 16 (2d Dist.), citing *State v. Zimpher*, 2014-Ohio-4401, ¶ 42. "It is generally accepted in Ohio that if counsel fails to make *and* renew a Crim.R. 29 motion during a jury trial, the issue of sufficiency is waived on appeal." *Id.*, citing *State v. Beesler*, 2003-Ohio-2815, ¶ 23 (11th Dist.). Even if Coleman had renewed his motion, however, his argument that his convictions were based on insufficient evidence lacks merit.

{¶ 15} Crim.R. 29(A) states that a court shall order an entry of judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." "'Reviewing the denial of a Crim.R. 29 motion therefore requires an appellate court to use the same standard as is used to review a sufficiency of the evidence claim.'" *Richardson* at ¶ 17, quoting *State v. Witcher*, 2007-Ohio-3960, ¶ 20 (6th Dist.). "In reviewing a claim of insufficient evidence, the relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Cleaned up.) *Id.*

{¶ 16} A weight of the evidence argument, on the other hand, challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v. Hufnagel*, 1996 WL 501470, *3 (2d Dist. Sept. 6, 1996). The proper test to apply to a manifest weight of the evidence inquiry is set forth in *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983): "[T]he court, reviewing the entire record, weighs the

7

evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

{¶ 17} "In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is, contrary to, the manifest weight of the evidence presented." *Wilson* at ¶ 14, citing *State v. McDaniel*, 1998 WL 214606 (2d Dist. May 1, 1998). Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render a conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 18} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Flores-Lopez*, 2017-Ohio-690, ¶ 49 (2d Dist.), citing *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.); *accord State v. Robinson*, 2015-Ohio-1167, ¶ 17 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Robinson* at ¶ 17, citing *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

{¶ 19} R.C. 2911.11 proscribes aggravated burglary and states:

(A) No person, by force, stealth, or deception, shall trespass in an

occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 20} R.C. 2911.01 governs aggravated robbery and states:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

{¶ 21} R.C. 2905.01 prohibits kidnapping and states, in relevant part:

(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

. . .

(2) To facilitate the commission of any felony or flight thereafter;

{¶ 22} R.C. 2913.02 proscribes theft and states: "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: (1) Without the consent of the owner or person authorized to give consent."

{¶ 23} Finally, R.C. 2923.13 governs having weapons while under disability and states:

> (A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
>
> . . .
>
> (2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.

{¶ 24} "There is no requirement that a defendant be specifically identified as the perpetrator of a crime by a witness testifying in court to uphold a conviction." *State v. Littlejohn*, 2015-Ohio-875, ¶ 37 (8th Dist.), citing *State v. Brown*, 2013-Ohio-2690, ¶ 30 (8th Dist.); *State v. Collins*, 2013-Ohio-488, ¶ 19 (8th Dist.). In Ohio, it is well established that "a defendant may be convicted solely on the basis of circumstantial evidence." *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988). "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus, *superseded on other grounds by state constitutional amendment as stated in State v. Smith*, 80 Ohio St.3d 89, 102, fn. 4 (1997). "Circumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation

10

of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved.'" *Nicely* at 150, quoting *Black's Law Dictionary* (5th Ed. 1979). As the State asserts, "DNA evidence identifying a defendant as a major contributor to the DNA profile found on an object linked to a crime is sufficient evidence to sustain a conviction." *State v. Eckard*, 2016-Ohio-5174, ¶ 33 (3d Dist.), citing *Brown* at ¶ 31, 35; *State v. Crabtree*, 2010-Ohio-2073, ¶ 17, 19 (9th Dist.); *State v. Bridgeman*, 2011-Ohio-2680, ¶ 16, 18 (2d Dist.).

{¶ 25} Ohio courts have acknowledged that gloves serve a practical purpose in criminal activity. *See State v. Howard*, 1982 WL 5203, *2, fn. 10 (8th Dist. Mar. 4, 1982) (citing testimony that gloves are worn in the perpetration of crimes, such as burglaries, to avoid fingerprint detection); *State v. Gatewood*, 2021-Ohio-3325, ¶ 47 (1st Dist.) (finding in a case in which the defendant argued self-defense that a glove with rubber grips found at the scene of a felonious assault with a weapon "tended to show [the defendant's] state of mind.")

{¶ 26} Here, Coleman does not dispute that an aggravated robbery occurred at E.T.'s home, that E.T. was kidnapped, that her Jeep was stolen, that he had a prior felony conviction, that he was a close associate of Smith's, or that the glove at issue was his. In the absence of testimony from E.T. specifically identifying Coleman, the jury could surmise from the totality of the evidence that Coleman was one of the men who victimized her and that he fled in her Jeep with Smith. She described three men—one with dreadlocks (Smith), one with light-colored skin, and one with dark-colored skin—ransacking her home. The jury was free to observe Coleman and determine if he was one of the men E.T. described. Coleman's glove containing his DNA as the major contributor was directly linked to the crime scene, and the jury could infer that Coleman had most recently worn the glove to engage in

11

criminal activity with the other men. Put differently, the DNA evidence served as the basis of a reasonable inference that defendant was one of the perpetrators of the crimes, and there was ample circumstantial evidence to support each count. Though Mu'min appeared to suggest that Smith may have worn the glove in Coleman's absence, the jury was free to discredit the self-serving and contradictory testimony of the mother of Coleman's children.

{¶ 27} Based on the foregoing, and after reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we conclude that Coleman's convictions were not against the manifest weight of the evidence and were supported by sufficient evidence. Accordingly, his assignments of error are overruled.

### III. Conclusion

{¶ 28} Having overruled Coleman's assignments of error, we affirm the judgment of the trial court.

. . . . . . . . . . . .

LEWIS, P.J., and HANSEMAN, J., concur.